UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 06 CR 0935 |
| v. ) | |
| ) | Judge John W. Darrah |
| MAURICE WILBON ) | |

## MEMORANDUM OPINION AND ORDER

The Defendant, Maurice Wilbon, was charged by a one-count indictment of bank robbery. Subsequently, the Defendant filed a Motion to Suppress Statements; and the parties filed briefs in support of their respective arguments. An evidentiary hearing on the motion was held, which consisted of the testimony of two of the agents that arrested the Defendant, the cooperating informant, and the Defendant. Following the hearing, the parties presented argument in post-hearing memoranda and response. The facts underlying the Defendant's statements and arrest are generally not in dispute and are summarized below based on the parties' briefs and the evidentiary hearing.

On December 20, 2005, the First Bank located at 2356 South Kedzie in Chicago, Illinois, was robbed by at least three individuals. On December 29, 2005, the Defendant was arrested on an unrelated retail theft charge and placed in an Illinois Department of Corrections facility in Jacksonville, Illinois.

Federal Bureau of Investigation Agent Daniel McCune was assigned to investigate the December 20, 2005 bank robbery. In October 2006, McCune began working with a cooperating informant ("CI"). Agent McCune had the CI transferred to the facility in Jacksonville, Illinois. While both the Defendant and the CI were incarcerated in Jacksonville, the Defendant made one general statement to the CI that some associates of his had robbed a bank. On October 27, 2006, the

Defendant was released from the Jacksonville facility. On November 9, 2006, the CI was released from the Jacksonville facility.

At Agent McCune's request, the CI contacted the Defendant a few weeks after his release from prison. Agent McCune believed that the Defendant would make incriminating statements about the bank robbery to the CI. The CI and the Defendant spoke on the phone several times and met in person several times. The early discussions and meetings were not recorded. During some of the meetings, the CI gave the Defendant cash. The FBI reimbursed the CI the approximately $135 he gave the Defendant. During these conversations and meetings, the Defendant spoke about a planned bank robbery in Wisconsin. As part of these discussions, the CI and the Defendant spoke about driving to Wisconsin on December 12, 2006, to case a bank the CI told the Defendant the CI intended to rob.

On December 7, 2006, the Defendant and the CI met at a public library, where the Defendant spoke to the CI about a business plan called Project JAM, which stands for Jails Ain't for Me. The CI brought up the subject of bank robberies.

At approximately 9:00 a.m. on December 12, 2006, the CI and the Defendant spoke by telephone about the planned trip to Wisconsin. In the mid-morning, the CI went to the Defendant's mother's residence, near 47th and Indiana in Chicago, and took the Defendant to a convenience store. While in the car, the Defendant smoked crack cocaine. The CI dropped the Defendant at his home and eventually picked him up again at approximately 4:00 p.m. to drive to Wisconsin. Upon learning that the Defendant's associates in previous bank robberies could not make the trip, Agent McCune had the CI contacted to have the CI stop and stall the Defendant until Agent McCune could arrive to interview the Defendant.

At approximately 5:00 p.m., the CI and the Defendant stopped at a Corner Bakery restaurant in Wilmette, Illinois. After Agent McCune, Agent Prejsnar and Agent Sowicki arrived at the restaurant, Agent McCune approached the Defendant as the Defendant was exiting the restroom. Agent McCune identified himself to the Defendant and informed him that he needed to speak with him. Agents McCune and Sowicki and the Defendant went back to the Defendant's table, and the Defendant was patted down. A metal pipe was found on the Defendant. Agent McCune knew that the Defendant was a crack cocaine user but he testified that he did not know that the pipe found on the Defendant was used for crack at that time. The agents left the pipe at the restaurant when they left. The Defendant was not given his Miranda warnings, and Agent McCune told the Defendant he was not under arrest. Agent Sowicki left the Defendant's table and sat with the CI at another table in the restaurant within the Defendant's view. Agent Prejsnar joined Agent McCune at the Defendant's table. Agent Prejsnar also asked some people sitting in the area to move because there was police activity going on.

Agent McCune told the Defendant that he knew that he was a bank robber and that they had been conducting surveillance on him for quite a while. Agent McCune showed the Defendant surveillance photographs from a bank robbery and handwritten notes the Defendant had given the CI about how to rob a bank. During Agent McCune's and the Defendant's conversation, the Defendant's speech was not slurred; and he was not acting erratically. There was nothing in the Defendant's demeanor or speech that led Agent McCune to believe that the Defendant was intoxicated.

After approximately twenty minutes, Agent McCune asked the Defendant to go to the FBI office that is located at 2111 West Roosevelt Road. While outside the restaurant, the Defendant

stated that he wanted to go home; and Agent McCune said, "Fine. Okay, go." The Defendant "kind of laughed" and said "I was just kidding." The Defendant also asked, "How am I going to get home?" One of the agents replied that he had heard that the Defendant was a pretty fast runner. Agent Prejsnar drove the Defendant and Agent McCune to the FBI office; during which time, the Defendant and Agent McCune sat together in the backseat of the vehicle.

Approximately forty-five minutes later, they arrived at the FBI office. After going inside the office, Agent McCune advised the Defendant that he was not under arrest but that it was their policy once inside FBI "space" that the *Miranda* warnings be read. Agent McCune read the Defendant his *Miranda* rights, and the Defendant signed a form indicating that he had received his *Miranda* rights.

Agent McCune interviewed the Defendant; during which time, the Defendant made some incriminating statements. During the interview at the FBI office, the Defendant's speech was not slurred; and he did not engage in any erratic behavior. The Defendant took a couple of breaks and twice telephoned his mother. Agent Prejsnar took notes during the interview. The notes were not shown to the Defendant. After the interview, Agent McCune asked the Defendant if he would sign a written statement; and the Defendant refused.

Agent McCune learned as early as November 30, 2006, that the Defendant used drugs, after he learned of a conversation between the CI and the Defendant's mother in which the Defendant's mother told the CI that the Defendant probably bought drugs with money that the CI gave to the Defendant. Agent McCune also learned that the Defendant's mother had stated that on November 29, 2006, the Defendant stole her DVD player to buy drugs. Agent McCune's report of

May 12, 2006 states that the Defendant is a crack cocaine user and that the Defendant's fingertips were scarred from Super Glue. The Defendant wore a hooded sweatshirt on May 12th but did not wear a coat.

Agent Prejsnar also testified; and his testimony mirrored that of Agent McCune, with the addition that while they were outside the restaurant, the Defendant said something about running away instead of going with the agents and that the agents would not be able to catch him. Agent Prejsnar "joked" back that because he ran college track, he could probably catch him.

The CI testified that while he and the Defendant were at the Jacksonville facility, the Defendant spoke to him about a scam business called Project JAM. While the CI was at Jacksonville, Agent McCune had $100 placed in the CI's commissary. When he was released from the Jacksonville facility, Agent McCune gave him another $300. Agent McCune also gave the CI additional money to reimburse money that he spent on "bus passes or telephone or stuff like that." The CI received payments for his cooperation in multiple cases in the amount of $6,800.

The Defendant testified that on December 12, 2006, the CI took him to buy cigarettes and crack cocaine. The Defendant smoked the crack cocaine in the car driven by the CI. The Defendant smoked crack cocaine on a daily basis and had smoked crack cocaine approximately five minutes before the CI picked him up to drive to Wisconsin. The CI knew that the Defendant was using crack cocaine.

The Defendant testified that when the Defendant and the CI left for Wisconsin on December 12, 2006, the Defendant was high, as he had been smoking crack cocaine throughout the previous night and that day. When the Defendant was approached by Agent McCune at the Corner Bakery, Agent McCune raised his shirt and revealed his weapon. Agent McCune ordered

the Defendant to sit down at the table and told the Defendant that he was "in a lot of trouble." Agent McCune told the Defendant it was in his interest to cooperate and, at one point, stated "Let's go." When the agents and the Defendant exited the restaurant, the Defendant asked if he was under arrest; and Agent McCune stated, "No, you're not under arrest." The Defendant asked, "What if I take off running right now?" Agent Prejsnar then stated, "I'm going to chase you down" and "You ain't fast enough." The Defendant then asked if he could go home and was told that he could go home. The Defendant stated that he did not have any money; and an agent stated, "You just told us how fast you was. It shouldn't take you much time to run to Chicago." The Defendant then went into the agent's car and was driven to the FBI office. While in the car, Agent McCune told the Defendant details about several bank robberies. After arriving at the FBI office, the Defendant testified he was still feeling the effects of the cocaine. Because of the cocaine, what the agents were saying to Defendant "wasn't really making any sense."

At the FBI office, the Defendant provided information to the agents about his involvement, and the involvement of others, in several bank robberies, including the bank robbery with which the Defendant is charged in this case. The Defendant denied his involvement in other bank robberies about which he was asked.

The Defendant is forty-two-years-old, has held several jobs, and received his Bachelor's Degree from MacMurray College. The Defendant has had at least five felony convictions in state court.

The Defendant moves to suppress his May 12, 2006 statement, arguing that his statement was not voluntary but was the product of the Government's improper tactics and drug intoxication.

A statement is not compelled within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his Constitutional privilege. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "A confession is voluntary if, in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. Coercive [government] activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment."
*United States v. Gillaum*, 372 F.3d 848, 856-57 (7th Cir. 2004) (*Gillaum*) (internal citations and quotations omitted). In applying the totality-of-the-circumstances test, a variety of factors may be considered, including but not limited to: whether the defendant received his *Miranda* rights; the individual characteristics of the defendant, such as the defendant's age, education, intelligence level, and mental state; the nature of the interrogations, such as duration, environment, access to restroom and food; and the conduct of the law enforcement officers, such as the use of physical punishment. *See Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004) (collecting cases).

"[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972);
*United States v. Guerrero-Herrera*, 590 F.2d 238, 242 (7th Cir. 1978).

Intoxication alone does not demonstrate that a statement was involuntary. *See United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004) (*Toro*); *United States v. Chrismon*, 965 F.2d 1465, 1469 (7th Cir. 1992) (*Chrismon*). "A diminished mental state [brought about by intoxication] is only

relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *Chrismon*, 965 F.2d at 1469. Furthermore, "outrageous" conduct by the police, in and of itself, does not constitute a violation of a person's rights under the due process clause of the Fifth or Fourteenth Amendment. *See Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003); \*United States v. Boyd*, 55 F.3d 239, 240 (7th Cir. 1995).

Here, the totality of the circumstances shows that the Defendant's statement was voluntary. The Defendant was of legal age, was educated, and had previous experience with law enforcement. The Defendant was advised of his constitutional rights and indicated that he understood such rights. The Defendant ate, drank, used the restroom, and was not handcuffed during the interrogation.

The Defendant was a long-term crack cocaine user and had smoked crack cocaine the day he made his statement. However, the initial interrogation at the restaurant and the subsequent statement at the FBI office, were made two to four hours after the Defendant had last smoked crack cocaine. The exhibits submitted during the evidentiary hearing, a National Institute on Drug Research Report about Cocaine Abuse and Addiction and a portion of the United States Sentencing Commission's Special Report to Congress on Cocaine and Federal Sentencing Policy, indicate that high from smoking crack cocaine is very short, five to ten minutes, and that the psychotropic effects of inhaled cocaine is sustained for approximately thirty minutes after the peak effects are attained. Thus, the Defendant was not high at the restaurant or the FBI office. The Defendant's demeanor during the car ride to the restaurant also supports a finding that the Defendant was not high. The Defendant appeared coherent, was able to converse and answer questions, was not acting erratically, and did not appear to be intoxicated. The Defendant was also able to readily testify to the events of the day at the evidentiary hearing. The Defendant's demeanor on the video surveillance tapes of his

interactions with the CI is of no difference than the Defendant's demeanor and manner of speech that he displayed while testifying at the evidentiary hearing.

Based on the above, the Defendant did not have a diminished mental state brought about by intoxication. Furthermore, any level of intoxication demonstrated by the Defendant, itself, does not make his statement involuntary. *Chrismon*, 965 F.2d at 1469.

The Defendant also cites to the Government's "outrageous" conduct in support of his motion. This conduct included providing money to the CI, who in turn provided money to the Defendant for the Defendant to purchase cocaine; the Government's knowledge that the Defendant was an addict; and questioning Defendant at a restaurant in Wilmette where the Defendant was essentially trapped because he had no means of getting home other than with the FBI. Even if this conduct by the Government is considered "outrageous," it does not constitute physical abuse, psychological intimidation, or deceptive interrogation tactics that overcame the defendant's free will.

Based on the above, the totality of the circumstances demonstrates that the Defendant's statement was voluntary. Accordingly, the Defendant's Motion to Suppress Evidence is denied.

Dated: 5-16-07

JOHN W. DARRAH
United States District Court Judge